**V.W. and R.W., Plaintiffs,**

v.

**Dr. Edward FAVOLISE, Superintendent of the Colchester Board of Education; and Colchester Board of Education,[1] Defendants.**

**Civ. No. H–88–594 (PCD).**

United States District Court, D. Connecticut.

July 17, 1990.

---

1. Pursuant to F.R.Civ.P. 21, individuals originally named in the complaint against whom this action was previously dismissed have been omitted from the caption. *See* Filings 22 and 27a.

Douglas M. Crockett, Connecticut Legal Services, Willimantic, Conn., for plaintiffs.

Julie A. Harris, Law Offices of George DuBorg, Wethersfield, Conn., Thomas B. Mooney, Peter Benner, Shipman & Goodwin, Hartford, Conn., Diane Whitney, John Whelan, Office of Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

THOMAS P. SMITH, United States Magistrate.

This is an action brought pursuant to § 615(e) of the Education of the Handicapped Act ("EHA" or "the Act"), 20 U.S.C. § 1415(e), and § 504 of the Rehabili-

tation Act, 29 U.S.C. § 794. Plaintiffs seek review of an administrative decision allowing defendant Colchester Board of Education ("the Board") to prohibit the tape recording of Planning and Placement Team ("PPT") meetings by parents of handicapped children. The parties have consented to trial before a magistrate, with appeal directly to the court of appeals for this circuit. 28 U.S.C. § 636(c). An evidentiary proceeding was held before the magistrate on May 15, 1990.

■ Initially it may be appropriate to dispel counsel's uncertainty as to the nature of the proceedings held on the above date and the disposition of plaintiffs' claims by means of this memorandum. Because all but one of the claims originally asserted in the complaint were previously dismissed by stipulation, *see* Pre–Trial Order (Filing 39), counsel had apparently agreed, prior to the May 15 proceeding, to address the remaining issue in cross-motions for summary judgment. Though no such motions were filed, counsel were unclear as to whether the court intended to hold an evidentiary hearing pursuant to Rule 56 or simply conduct a trial. *See* Transcript at 12–13.

When, as here, the parties have consented to trial before a magistrate pursuant to § 636(c), the local rules provide that "the Magistrate is empowered to conduct all proceedings, *e.g.*, to determine all motions, to preside at trial, and to direct entry of judgment." Local R.U.S.Mags. 4(a)(1)(D.Conn.).

Rule 73(a) similarly provides that

When specially designated to exercise such jurisdiction by local rule or order of the district court and when all parties consent thereto, a magistrate may exercise the authority provided by Title 28 U.S.C. § 636(c) and *may conduct any and all proceedings ... in a civil case.*

F.R.Civ.P. 73(a) (emphasis added). The Advisory Committee Notes also indicate that a magistrate's exercise of civil jurisdiction includes "the power to conduct ... trials, and to decide dispositive motions." It is clear, therefore, that had competing mo-

tions for summary judgment been pending, the magistrate would have been able to conduct an evidentiary hearing pursuant to Rule 56 and determine whether genuine issues of material fact precluded summary disposition.

As noted from the bench, however, it would not make such sense for the magistrate to receive testimony with respect to the substantive issues only to conclude that factual issues prevent the granting of summary judgment. *See* Transcript at 14–15. Where there has been a consent to a plenary court trial pursuant to § 636(c), Rule 73 and the local rules compel the conclusion that a magistrate may, as factfinder, resolve factual issues at trial, or, to the extent that there are no genuinely disputed issues of material fact, dispose of the case according to Rule 56. *See also McCarthy v. Bronson*, 906 F.2d 835, 839 (2d Cir.1990).

Having therefore considered the testimony of the several witnesses presented at the May 15 proceeding, as well as the competing memoranda (Filings 41 and 42) and the various record documents, the court reaches the following factual and legal conclusions.

## I.

Congress enacted the EHA "to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, and to assure that the rights of handicapped children and their parents ... are protected...." 20 U.S.C. § 1400(c). In addition to providing federal funding to state or local educational agencies ("LEAs") implementing programs meeting these substantive objectives, the Act also establishes "a comprehensive system of procedural safeguards designed to ensure parental participation in decisions concerning the education of their disabled children and to provide administrative and judicial review of any decisions with which those parents disagree." *Honig v. Doe,*

484 U.S. 305, 308, 108 S.Ct. 592, 596, 98 L.Ed.2d 686 (1988); 20 U.S.C. § 1415.

Foremost among these decisions are those concerned with the development and administration of each child's "individualized education program" ("IEP"). An IEP comprises a written statement of the child's present educational performance, establishes annual and short-term instructional objectives, describes the special educational services that will be provided to the child, and sets forth the criteria and procedures that will be used to evaluate whether these educational goals have been achieved. 20 U.S.C. § 1401(a)(19). The EHA requires that IEPs be developed in meetings between school district representatives, teachers, parents, and, whenever appropriate, the child. *Id.*[2] Further, each IEP must be annually reviewed to ensure that it is consistent with the statutory mandate of free special education formulated to address the specific needs of each child. 20 U.S.C. § 1414(a)(5); *see also* 34 C.F.R. § 300.346.

The Act and its attendant regulations repeatedly recognize the importance "and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig*, 484 U.S. at 311, 108 S.Ct. at 598; *see also Board of Educ. v. Rowley*, 458 U.S. 176, 182 n. 6, 102 S.Ct. 3034, 3038–39 n. 6, 73 L.Ed.2d 690 (1982); 20 U.S.C. §§ 1400(c), 1401(a)(19), 1415; 34 C.F.R. §§ 300.344–45. In an effort to guarantee this participation, "recognizing that this cooperative approach w[ill] not always produce a consensus ..., and that in any disputes the school officials would have a natural advantage," *School Comm. v. Department of Educ.*, 471 U.S. 359, 368, 105 S.Ct. 1996, 2001–02, 85 L.Ed.2d 385 (1985), the EHA also establishes a number of "procedural safeguards" to insure the proper resolution of these disputes, including the right of parents to "examine all relevant records with respect to the identification, evaluation, and educational placement of the child," 20 U.S.C.

---

**2.** Under Connecticut Department of Education regulations this group comprises a "Planning and Placement Team," or "PPT." *See* Conn. Agency Regs. §§ 10–76d–10, –12.

§ 1415(b)(1)(A); written prior notice to the parent of administrative action regarding their child's educational program, § 1415(b)(1)(C); and the opportunity to present complaints, § 1415(b)(1)(E). When such complaints are made, the parent is entitled to "an impartial due process hearing," conducted by the local education agency, § 1415(b)(2); a review of LEA decisions by the state education agency, § 1415(c); and the right to appeal a state agency decision by initiating a civil action in state or federal court, § 1415(e)(2).

Plaintiffs in the present action are parents of a handicapped child presently receiving special education in the Colchester (Connecticut) School District. The complaint alleges, among other things, that school officials refused to hold IEP meetings as long as V.W., the child's mother, intended to tape record the meetings. As indicated above, the only issue remaining is whether the board's action was consistent with the policies and provisions of the EHA and the Rehabilitation Act.

## II.

The parties have framed this issue as one involving competing interests. On one hand is the purported interest of the plaintiff in preserving what is said at PPT meetings so that school personnel can be held accountable; on the other, the interest of the school board in avoiding the "chilling" effect tape recording would allegedly have on PPT discussions and the collaborative process used to formulate IEPs.

In resolving a similar dispute, Judge Nevas recently weighed the competing interests and concluded that the parent had "a legitimate and substantial interest in tape recording [ ]PPT meetings." *E.H. v. Tirozzi*, 735 F.Supp. 53, 57 (D.Conn.1990). In *E.H.*, the parent who wished to tape record had difficulty understanding English. Taking notes or reviewing written summaries of PPT discussions gave her an inadequate understanding of both the meeting and her child's IEP. Citing a parent's unequivocal right under the EHA to participate in and help develop these programs, as well as their concomitant right to present com-

plaints, Judge Nevas concluded that unless a parent adequately understood the PPT proceedings, she could not "effectively evaluate the program to determine whether ... it [is] in her child's best interest," nor could she complain, "in any meaningful way, with respect to any matter relating to the IEP ... She is thus effectively deprived of one of the procedural safeguards of the EHA." *Id.*

The defendant teacher in *E.H.* also asserted a right not to be recorded. While assuming such a "privacy" right existed, Judge Nevas found that "such interests would be outweighed by the legitimate and substantial interests of the EHA in ensuring parents a right to meaningful participation [in the IEP process]." *Id.* at 58. Nor did the teacher have a legitimate or substantial personal interest in not having her comments tape recorded. *Id.* at 59.

Defendants in the present case argue that *E.H.* should be strictly limited to its facts. The board's interest in privacy and in engendering open and "free flowing" PPT meetings should be outweighed, they contend, only in instances where a parent is not fluent in English and consequently cannot understand the discussion.

Plaintiff V.W., while acknowledging that her need for a taped record of the PPT meeting is not as obvious as E.H.'s, does contend that a disabling injury to her hand makes notetaking difficult. As a result, she claims that she cannot fully understand PPT discussions and therefore is not able to effectively evaluate her child's IEP. Plaintiff R.W., who cannot attend PPT meetings because of his work schedule, argues that a verbatim record would enable him to gain some understanding of what transpired, and would allow him to discuss and arrive at informed decisions regarding his son's education.

Defendants have articulated no compelling reason to depart from the thorough and well-supported decision reached in *E.H.* They concede that neither the EHA nor the regulations address the question of tape recording, but argue that this omission implies a Congressional intent to prohibit such taping. As Judge Nevas ably

pointed out, however, this argument runs counter to the explicit language of 34 C.F.R. § 300.345 and 20 U.S.C. § 1415(b)(1). *See E.H.*, 735 F.Supp. at 57 n. 2. To the extent that the present defendants have an interest in prohibiting the tape recording of PPT discussions, that interest is outweighed by the interests of a parent in understanding and participating in the formulation and evaluation of programs relating to the education of their handicapped children.

### III.

The "competing interests" analysis, however, ordinarily used where a plaintiff is claiming a due process violation as a result of some governmental action, would seem to be inapposite to the present case. Defendants have substantially relied on the plaintiffs' perceived need to establish some basis for their claimed right to record the PPT meetings. The parents have countered by pointing out the lack of statutory or regulatory authority for the Board's actions.

■ Plaintiffs need not demonstrate some wellspring for their right to tape record meetings, particularly where, as here, they are given a statutory right to attend and participate in those meetings. It would seem that such a right is, and should be, innate. As Justice Harlan so eloquently put it:

> '[L]iberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints....

*Poe v. Ullman*, 367 U.S. 497, 543, 81 S.Ct. 1752, 1776–77, 6 L.Ed.2d 989 (Harlan, J., dissenting). In other words, insofar as the government is concerned, people are free to do and say what they like, unless and until the government acts, *pursuant to law*, to restrict that freedom. Such acts are constitutional as long as they are not arbitrary, effectuate a governmental interest, which in some cases must be compelling, or violative of any of the other "tests" associated with constitutional law jurisprudence.

■ Where the present case departs from this formula is with respect to the board's actions. Clearly, neither the EHA nor the state or federal regulations give the school authority to prohibit tape recording.[3] Though defendants asserted that such authority is implicit, it borders on the tautological to suggest that where authority is omitted, it is to be implied. In fact, what both the statute and the regulations require is that LEAs make every effort to ensure the full and meaningful participation of parents in the IEP process. *See, e.g.*, Conn. Agency Regs. § 10–76d–12(c)(5).

■ The first inquiry in cases such as this should be, therefore, whether the government can demonstrate some authority for its actions. Only after some justification for the governmental restraint can be shown should the plaintiff need to come forward with some basis for their claimed right.[4]

■ Clearly the school board has not demonstrated any authority for its actions in the instant case. Indeed, the testimony of Mr. Marc Bishop, director of Special Education in Colchester, strongly suggests that, in implementing programs designed to achieve the objectives set forth in the EHA, the defendant school·district pays

---

3. In an informal opinion, the Office of Special Education, which administers EHA programs for the Department of Education, explicitly stated that the statute did not grant LEAs the authority to prohibit tape recording. *See* OSEP Letter to Doerr, Educ. Handicapped L.Rep. (CRR) 213:127–28 (Apr. 15, 1988).

4. As its decision makes clear, the state Department of Education also erroneously placed the initial burden on the parents to demonstrate the source of their claimed right to tape record. *See* Administrative Record, vol. IV, Exh. SB–24 (Notice of Final Hearing Decision, July 20, 1988) at 16 ("The weight of the legal evidence submitted by the parent does not support the contention that the parent has a right to tape the PPT meetings over the objection of the Board.").

little attention to some of the specific requirements of the Act. *See* Transcript at 71–120. The thrust of his comments, intended to bolster defendants' argument that allowing tape recording would inhibit "open" PPT dialogues, was that, if taping were allowed, school officials and teachers would meet privately to arrive at a consensus that would, implicitly, dictate the substance of the IEP. Parents would be "left out of the collaborative 'loop'," and the other PPT members would have avoided the "danger" of voicing minority opinions "on the record" which might be used against the school system in future litigation. *See* Defendants' Memorandum (Filing 42) at 12.

In numerous ways, such a process would clearly violate the EHA. It is also disingenuous to argue that, unless the board's action is upheld, it will knowingly contravene the statute. This argument, along with Mr. Bishop's revealing testimony, and the board's draconian action with respect to plaintiff's tape recording request, compel the conclusion that the defendant is actively attempting to assert complete control over the IEP process in derogation of plaintiff's right of participation guaranteed by the EHA.

The court is not convinced that tape recording PPT discussions will have the "chilling" consequences defendants threaten. Even if it would, and the "professional" members of the team resort to illegal "consensus-building," it is manifest that plaintiffs would have an unquestioned right to seek judicial enforcement of their statutory right to participate in the formulation of their child's educational program. For it should be apparent that, in the context of the EHA, participation means something more than mere presence; it means being afforded the opportunity to be an equal collaborator, whose views are entitled to as much consideration and weight as those of other members of the team, in the formulation and evaluation of their child's education.

Accordingly, the court finds that defendants' unilateral action in placing conditions on the conduct of PPT meetings, specifically the requirement that the discussion not be tape recorded by a participating parent, is inconsistent with and violates both the policies and provisions of the EHA.[5]

### IV.

For all of the foregoing reasons, plaintiffs are entitled to a judgment on the complaint. The plaintiffs will submit a draft judgment within 15 days of this date.

---

5. Because of the disposition of plaintiffs' claims pursuant to the EHA, there is no need to consider the related claims asserted under the Rehabilitation Act. Accordingly, no opinion is expressed as to their merit.